KENNETH C. GREENE [SBN 95210]
**LAW OFFICES OF KENNETH CHARLES GREENE**
5743 CORSA AVENUE   SUITE 208
WESTLAKE VILLAGE, CA  91362
TEL: 818.575.9095
FAX: 805.435.2655
EMAIL: kenlaw100@gmail.com

*Attorney for Creditor*
BAOHUA ZHENG

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

In re:

**REX SPIRITS, INC.,**

Debtor.

CASE NO. 6:13-BK-24063-SC

CHAPTER 11

MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF

DATE:    DECEMBER 10, 2013
TIME:    1:30 PM
PLACE:   VIDEO HEARING ROOM 126
         3420 TWELFTH STREET
         RIVERSIDE, CA 92501

PLACE:   COURTROOM 5C
         411 WEST FOURTH STREET
         SANTA ANA, CA 92701

*(HEARINGS TO BE HELD CONCURRENTLY AT BOTH LOCATIONS)*

MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
THEREOF; DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF

1

TO: THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE; DEBTOR REX SPIRITS, INC., AND ITS COUNSEL OF RECORD; THE UNITED STATES TRUSTEE; AND ALL OTHER PARTIES IN INTEREST:

BAOHUA ZHENG, a creditor herein, will and does hereby move this Court for entry of an Order, pursuant to Section 1112(b) of the United States Bankruptcy Code (11 U.S.C. §§101 *et seq.*) dismissing or converting the Chapter 11 case of Rex Spirits, Inc. or, in the alternative, pursuant to Section 1104 of the Bankruptcy Code, appointing a Chapter 11 trustee to manage the Debtor's affairs, and respectfully represents as follows:

## BACKGROUND

1. On August 19, 2013, ("Petition Date"), Rex Spirits, Inc., the Debtor-in-Possession herein ("Debtor") filed a petition for relief under Chapter 11 of the United States Bankruptcy Code.

2. The Debtor is currently operating as Debtor-in-Possession in accordance with the provisions of 11 U.S.C. §§1101 *et seq.*

3. Mr. Baohua Zheng ("Zheng") is a creditor of the within estate pursuant to a Loan Agreement and Promissory Note ("Note") in the original amount of $1,000,000. See, Declaration of John M. Kalajian ("Kalajian Declaration") filed and served herewith, at Paragraph 2. A true and correct copy of the Note is attached to the Kalajian Declaration as Exhibit "A" thereto.

4. Zheng's loan to Debtor of $1 million was made for the express, written purpose of assisting Debtor's business. Pursuant to Paragraph 4 of the Note, entitled "Use of Proceeds", it was agreed that:

> Borrower shall use the proceeds of the loan for the purpose of funding the products development, products manufacturing, human resources, and marketing purposes of the Borrower, <u>not any other purposes. Otherwise, it is considered breach of the agreement and the principal amount is due immediately.</u> [Emphasis added]

See, Kalajian Declaration at Paragraph 3.

5. Rex acknowledged in its verified answers to written interrogatories in the State Court Case that it had repaid Zheng only $300,000 of the $100,000,000 loan. There is presently due and outstanding under the terms of the Note, Exhibit "A" hereto, the sum of $700,000.00, together with statutory interest at the rate of ten percent (10%) per annum and attorney's fees, for a total claim estimated to be in excess of $800,000, now due and payable. See, Kalajian Declaration at Paragraph 4.

6. Zheng's claim is at least partially secured pursuant to a Right to Attach Order and Writ of Attachment obtained and levied prior to the Petition Date. The value of the assets secured by the Writ of Attachment is presently unknown. See, Kalajian Declaration at Paragraph 5.

7. The Right to Attach Order and Writ of Attachment were obtained in an action commenced by Zheng against Debtor in the Los Angeles Superior Court, Case No. KC 065753.

MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
THEREOF; DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF

1

8. Debtor has commenced an adversary proceeding related to the within Chapter 11 case attempting, *inter alia*, to avoid certain alleged payments as preferential transfers in accordance with 11 U.S.C. §§547(b) and 550. Zheng denies that the alleged payments were preferences. See, Kalajian Declaration at Paragraph 6.

9. Zheng is informed and believes and based thereon alleges that Debtor has engaged in self-dealing, gross mismanagement, and misappropriation of funds, as more fully discussed herein below, both before and after the Petition Date, and that such acts have damaged and continue to damage Zheng irreparably, warranting the relief sought herein. See, Kalajian Declaration at Paragraph 7.

10. The following allegations, made on information and belief, form the factual basis for the within motion.

11. A Profit and Loss Statement dated December 12, 2012, and authored by Desi Ortiz (the brother of Sal Ortiz, Debtor's president), a true and correct copy of which is attached to the Kalajian Declaration as Exhibit "B" thereto, reflects, *inter alia*, excessive business expenses and multiple personal expenditures unrelated to Debtor's business, in breach of the terms and conditions of the Note, and, perhaps of greater significance, indicative of the Debtor's proclivity towards mismanagement and self-dealing, which are among the grounds for the within motion. See, Kalajian Declaration at Paragraph 8. As indicated on the Profit and Loss Statement ("P&L"), these expenditures are as follows:

   a. Payroll of $126,609.23 (P&L page 14), plus an additional $53,171.39 for "sub-contractors" (P&L page 18), including a $10,000 expense for a "marketing team"

as well as a $20,000 payment to Desi Ortiz in January 2013, essentially depleting Debtor's bank account;

b. Travel, including multiple junkets to Las Vegas $30,454.66 (P&L page 21) including $5,341.28 for limousine travel, $502.68 for "WSWA Investor Hotel Suite at Caesar's Palace, and a $1,058.72 expense for "Vegas Business Trip Room Charge";

c. Extravagant dinners including $586.05 at the Palms (P&L page 8); $1,473.92 and $1,155.88 at Caesar's Palace hotel rooms (P&L page 8);

d. Daily lunches and dinners of $15,426.91 (P&L page 10);

e. Extraordinary gas expenses of $4605.30 (P&L page7);

f. Cash expenditures with no breakdown or receipts including $800 "Cash to Sal Ortiz for Business Trip Per Diem" (P&L page 9); and

g. Miscellaneous suspect expenditures including $1134 at Paris Box Office for "Entertainment for Kevin, Bin, Sal and Desi" (P&L page 8).

12. To fully appreciate the degree to which these actions violate the express terms of the Note, as well as highlight the lack of integrity of the Debtor, it should be noted that during the time period in which these expenditures were made, the Debtor had gross income of approximately $60,000 which, after the cost of goods sold, netted revenues of only $39,653.16 against total expenditures of $428,310.33. Debtor's "business" activities and expenses thus accounted for the loss of approximately 40% of Zheng's $1 million investment in less than a year. Not only does this conduct suggest gross mismanagement but, when weighed against expenditures such as a more than $5000 suite at Caesar's

Palace, renders Debtor's integrity suspect and supports the relief requested herein. See, Kalajian Declaration at Paragraph 9.

13. A consent judgment in a trademark infringement case against Rex requires Debtor to stop selling product by February 2014 and to assign trademarks to a company called School of Design, which was the plaintiff in that case. The consent judgment further limits the Debtor's ability to market its remaining inventory of King Rex Vodka worldwide for one year, except in the States of Louisiana, Mississippi and Alabama. Accordingly, the continued viability of the Debtor's operations is doubtful and renders this Chapter 11 destined for conversion and liquidation. See, Kalajian Declaration at Paragraph 10. A true and correct copy of the Consent Judgment is attached to the Request for Judicial Notice filed and served herewith as Exhibit "A" thereto.

14. It appears that on or about July 26, 2013, **less than one month before the Petition Date**, Sal Ortiz, the president of Debtor, removed 710 cases of vodka from a warehouse called "Biagi Brothers." There does not appear to be any reference to these cases in Debtor's prepetition QuickBooks, in the Debtor's Statement of Financial Affairs at questions 10 or elsewhere. Even selling the cases at $120 per case, (which is just about break even after the costs of manufacture and shipping), this represents more than $85,000 in missing assets. See, Kalajian Declaration at Paragraph 11. A copy of the records from Biagi Bros showing the cases were released to Ortiz is attached to the Kalajian Declaration as Exhibit "C" thereto.

MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
THEREOF; DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF

1

15. It appears that the Debtor may have certain undisclosed assets to wit, 4050 bottles of vodka located in South Carolina and valued at approximately $488,000, and 1422 bottles of vodka located in China and valued at approximately $32,000, neither of which appear to be listed as assets on the Debtor's schedules filed herein. See, Kalajian Declaration at Paragraph 12.

16. The Debtor's Schedules, Statement of Financial Affairs, and the sole Monthly Operating Report filed to date, measured against the unfortunate business record discussed above, suggest the inevitability of liquidation with little or no viable hope of reorganization. Allowing the Debtor to retain control of the few assets in its possession while it spirals into liquidation would serve no rehabilitative purpose and would put all creditors, including Zheng, at risk of irreparable harm. Given the demonstrable lack of success since the inception of the Debtor's business, together with the complete disregard for the safekeeping of the investment proceeds to which it was entrusted, continuing unsupervised in a Chapter 11 proceeding would cause more harm than good. Accordingly, dismissal or conversion of the case to Chapter 7, is necessary and appropriate pursuant to Section 1112(b) of the Bankruptcy Code, or, in the alternative, pursuant to Section 1104, appointing a Trustee to manage the Debtor's affairs.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Dismissal or Conversion Pursuant to Section 1112(b)

1. Section 1112(b) enumerates several examples of what constitutes "cause" to dismiss or convert a case, including where there is (i) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation, (ii) inability to effectuate a plan, or (iii) unreasonable delay by the debtor that is prejudicial to creditors. *See* 11 U.S.C. §1112(b)(1), 1112(b)(2), 1112(b)(3).

2. A finding of "cause" is not limited to the grounds stated in Section 1112(b). *See* 11 U.S.C. §102(3) (in construing the Bankruptcy Code, the terms "includes" and "including" are not limiting).

### Appointment of a Trustee Pursuant to Section 1104

3. Section 1104 of the Bankruptcy Court provides in pertinent part:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest and after notice and a hearing, the court *shall* order the appointment of a trustee –
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . .;
>
> (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate . . .; or

MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
THEREOF; DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF

1

(3) if grounds exist to convert or dismiss the case under Section 1112, but the court determines that the appointment of a trustee of examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1104(a) (emphasis added).

4. In accordance with the express language of Section 1104(a)(1), courts have consistently held that "the appointment of a trustee is mandatory upon a determination of cause." *In re Marvel Entertainment Group, Inc.* 140 F. 3d 463, 472 (3d Cir. 1998).

5. Under Section 1104(a)(2), among the factors considered are (i) the trustworthiness of the debtor; (ii) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitations; (iii) the confidence – or lack thereof – of the business community and of creditors in current management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *In re Adelphia Communications Corp.* 336 B. R. 610, 658 (Bank, S.D.N.Y.2006)

6. Applying these factors to the case, it is clear that ample grounds exist for either conversion or appointment of a Chapter 11 Trustee. The Debtor has demonstrated, at a minimum, gross mismanagement leading up to the Petition Date. Moreover, the mysterious disappearance of more than $80,000 worth of inventory less than a month before the Petition date suggests fraud, as does the Debtor's failure to list certain assets as described above. Additionally, Zheng will present evidence, if needed, that neither Debtor nor Debtor's product have any credibility in the business community.

7. Simply stated, the Debtor's manifest bad conduct has created a powerful basis to conclude that it cannot be relied on or trusted to properly discharge the duties of a Debtor-in-Possession in an honest and proper manner. Given the compelling evidence supporting this

MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
THEREOF; DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF

1

conclusion and the precedent cited, Zheng submits that under the mandatory language of Section 1104 this Court, if it does not otherwise dismiss or convert the Debtor's cases, must appoint a Trustee to manage the Debtors' affairs.

8. No prior request has been made for the relief requested herein.

**WHEREFORE**, Zheng requests entry of an order (i) pursuant to Section 1112(b) of the Bankruptcy Code dismissing or converting the Debtor' case or (ii), in the alternative, pursuant to Section 1104 of the Bankruptcy Code, appointing a Trustee to manage the Debtor's affairs and (iii) providing such other relief as is just.

Dated: October 30, 2012

                              **LAW OFFICES OF
KENNETH CHARLES GREENE**

                              By: Kenneth C. Greene

**DECLARATION OF JOHN M. KALAJIAN IN SUPPORT OF
MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE,
FOR APPOINTMENT OF CHAPTER 11 TRUSTEE**

I, John M. Kalajian, hereby declare:

1. I am the attorney for creditor Boahua Zheng in the state court action

entitled Boahua Zheng v. Rex Spirits, Inc., ("Rex"or "Debtor") Los Angeles County Superior Court Case Number KC KC065753 (hereafter "State Court Case"). Trial was set in the State Court Case for August 26, 2013. Substantial discovery had been completed and the deposition of the Person Most Knowledgeable had been scheduled after multiple delays requested by Debtor.  I have personal knowledge of the facts set forth herein, except as to those which are alleged on information and belief. If called as a witness, I could and would testify competently to the following allegations.

    2.    Boahua Zheng ("Zheng") is a creditor of the within estate pursuant to a Loan Agreement and Promissory Note ("Note") in the original amount of $1,000,000. A true and correct copy of the Note is attached hereto as Exhibit "A".  In the State Court Case, Rex acknowledged the genuineness of the loan documents in Requests for Admission and responded with verified answers to written interrogatories that Rex received a $1,000,000 loan from Zheng.

    2.    The loan documents provide pursuant to Paragraph 4 of the Note, that:

> Borrower shall use the proceeds of the loan for the purpose of funding the products development, products manufacturing, human resources, and marketing purposes of the Borrower, <u>not any other purposes. Otherwise, it is considered breach of the agreement and the principal amount is due immediately.</u>
> [Emphasis added]

    4.    Rex acknowledged in its verified answers to written interrogatories in the State Court Case that it had repaid Zheng only $300,000 of the $100,000,000 loan. There is presently due and outstanding under the terms of the Note, Exhibit "A" hereto, the sum of $700,000.00,

MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
THEREOF; DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF
1

together with statutory interest at the rate of ten percent (10%) per annum and attorney's fees, for a total claim estimated to be in excess of $800,000 total, now due and payable.

5. In the State Court Case, Zheng applied for and was issued a Right to Order and Writ of Attachment prior to the petition date.

6. I am informed and believe that the Rex has commenced an adversary proceeding related to the within Chapter 11 case attempting, *inter alia*, to avoid certain alleged payments as preferential transfers in accordance with 11 U.S.C. §§547(b) and 550. Based upon all of the corporate records, records of the minutes of the meeting of directors, minutes and other documents obtained from Rex during discovery of the State Court Case, no records have been produced by Rex that suggest that Boahua Zheng was an officer, or director of Rex nor is there any evidence that Zheng controlled or operated Rex in any way. According to verified responses to special interrogatories, there was only one face to face meeting between Sal Ortiz and Zheng which took place in December, 2011 and no further direct contact between the Zheng and Ortiz at any time thereafter. Zheng denies that the $300,000 payment issued to Zheng on the due date of the loan is January, 2013 was a "preferential" payment under the bankruptcy code inasmuch as the payment was made approximately six months before this within bankruptcy proceeding was filed and Zheng was not an insider under any definition of that term.

7. Based upon my review of the written discovery responses and records and documents produced in the State Court Case, it is undisputed that Rex did not actually have a vodka product to actually sell, nor did any production of vodka products take place until approximately

November, 2011. Based upon the documents produced by Rex in the State Court Case, I am informed and believe and based thereon allege that Rex, and, in particular, Rex's Chief Operating Officer/President/Owner (as self-described on certain of his correspondence) has engaged in self-dealing, gross mismanagement, and misappropriation of funds for the personal use of himself, friends and his family members both before and after the Petition Date, and that such acts have damaged and continue to damage Zheng and other creditor of the estate irreparably.

8. A Profit and Loss Statement dated December 12, 2012, was produced in verified responses to discovery in the State Court Case and authored by Desi Ortiz (the brother of Sal Ortiz, Rex's president)), a true and correct copy of which is attached hereto as Exhibit "B" reflects, *inter alia*, excessive business expenses and multiple personal expenditures unrelated to Rex's business, in breach of the terms and conditions of the Note, and, perhaps of greater significance, indicative of the Debtor's proclivity towards mismanagement and self-dealing, which are among the grounds for the within motion. As indicated on the Profit and Loss Statement ("P&L"), these expenditures are as follows:

> a. Payroll of $126,609.23 (P&L page 14), plus an additional $53,171.39 for "sub-contractors" (P&L page 18), including a $10,000 expense for a "marketing team", and a $20,000 payment to Desi Ortiz in January 2013 (essentially depleting Debtor's bank account balances at Chino Business Bank);
> b. Travel, including $30,454.66 for multiple junkets to Las Vegas (P&L page 21), $5,341.28 for limousine travel, $502.68 for "WSWA Investor Hotel Suite at Caesar's Palace, and

MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
THEREOF; DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF
1

$1,058.72 for "Vegas Business Trip Room Charge"; These trips appear to have occurred in April, May, June, July, September and October of 2011, all during a time when Debtor had no product for sale and when there could be no legitimate marketing or business related component for traveling to Las Vegas.

c. Extravagant dinners including $586.05 at the Palms (P&L page 8), $1,473.92 and $1,155.88 at Caesar's Palace hotel rooms (P&L page 8);

d. Daily lunches and dinners of $15,426.91 (P&L page 10);

e. Extraordinary gas expenses of $4605.30 (note that there are days when the car is used three to four times per day (P&L page7) ;

f. Cash expenditures with no breakdown or receipts including $800 for "Cash to Sal Ortiz for Business Trip Per Diem" (P&L page 9); and

g. Miscellaneous suspect expenditures including $1134 at Paris Box Office for "Entertainment for Kevin, Bin, Sal and Desi" (P&L page 8).

9. To fully appreciate the degree to which these actions violate the express terms of the Note, as well as highlight the Debtors' lack of integrity, it should be noted that during the time period in which these expenditures were made, the Debtor had gross income of approximately $60,000 which, after the cost of goods sold, netted revenues of only $39,653.16 against total expenditures of $428,310.33. Debtor's "business" activities thus accounted for the loss of approximately 40% of my $1 million investment in less than a year. Not only does this conduct suggest gross mismanagement but, when weighed against expenditures such as a $5000 suite at

MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF
CHAPTER 11 TRUSTEE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
THEREOF; DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF

Caesar's Palace, such conduct renders Debtor's integrity suspect and supports the relief requested herein.

10. Shortly after Rex first marketed the vodka product, it was sued and a Consent Judgment was entered in a trademark infringement case against Rex Spirits, Inc. The Consent Judgment requires Debtor to stop selling product by February 2014 and to assign trademarks to a company called School of Design, which was the Plaintiff in that action. The Consent Judgment further limits the Debtor's ability to market its remaining inventory of King Rex Vodka worldwide for one year, except for the States of Louisiana, Mississippi and Alabama.

11. I obtained documents pursuant to a subpoena served on Biagi Bros., a warehouse that stocked debtor's vodka products, showing that on July 26, 2013, less than month before the Petition Date, Sal Ortiz, the president of Debtor, removed 710 cases of vodka from Biagi Bros. warehouse. There does not appear to be any reference to this transfer in Debtor's prepetition QuickBooks reports, its Statement of Financial Affairs (at question 10) or elsewhere. At a value of $200 per case, this represents more than $140,000 in missing assets. A copy of the records from Biagi Bros showing the cases were released to Ortiz is attached hereto as Exhibit "C".

12. I am informed and believe and based thereon allege that the Debtor may have certain undisclosed assets to wit, 4050 bottles of vodka located in South Carolina and valued at approximately $488,000, and 1422 bottles of vodka located in China and valued at approximately $32,000, neither of which appear to be listed as assets on the Debtor's schedules filed herein.

13. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of October, 2013 at Simi Valley, CA.

_____
JOHN M. KALAJIAN

NOTICE OF MOTION TO CONVERT CASE, OR, IN THE ALTERNATIVE, FOR APPOINTMENT OF CHAPTER 11 TRUSTEE, MEMORANDUM OF POINTS AND AUTHORIES ISO MOTION, DECLARATION OF JOHN M. KALAJIAN IN SUPPORT THEREOF

1